Dear Dr. Trail:
You have requested an Attorney General's opinion on behalf of the Louisiana State University Medical Center (LSUMC) and the Board of Supervisors of Louisiana State University and Agricultural and Mechanical College (Board).
Your letter requests an opinion on four legal issues arising out of the Statement of Facts in several items of correspondence which explains the proposed transactions between the Board, Entergy Thermal, a division of Entergy Business Solutions, Inc. (Entergy), and New Orleans Medical Center Complex, Inc. (NORMC), as modified by subsequent correspondence on behalf of LSUMC and the Board.
The Statement of Facts, as presented in your opinion request, is as follows:
 STATEMENT OF FACTS The Board contemplates entering into a cooperative endeavor with Entergy and NORMC[1], pursuant to which the Board would enter into the Ground Lease of the Land to NORMC for a term of twenty (20) years. Under the terms of the Ground Lease, NORMC would be obligated to demolish two buildings on the land (formerly Charity Hospital property but not part of the hospital itself) and then construct the Building to include (i) a parking garage and (ii) space on the roof and most of the ground level to accommodate Entergy's installation of a thermal energy plant (the "New Plant") to provide cost-efficient, pollutant diminished cooling to various health-care facilities and other buildings in the NORMC area owned by the Board, other NORMC members and public or private entities. NORMC would, also for the same twenty-year term, exchange to the Board exclusive use and occupancy of the parking garage portion of the Building for exclusive use and occupancy of the LSU and Charity Existing Plants which NORMC would sublease to Entergy (and Entergy would rehabilitate) to be a part of the district thermal energy system. NORMC will lease to Entergy the portion of the Building in which Entergy will build (and own) the New Plant, and NORMC also will sublease to Entergy the existing Plants (as defined below), all of which will be part of the district energy system operated by Entergy. Under the terms of the Cooperative Endeavor Agreement, the Board will be obligated to reimburse Entergy for all of the costs associated with such cooperative production of all present and future thermal energy requirements for all present and future LSUMC buildings in the NORMC Area for a term of twenty (20) years. The Board is providing the Existing Plants and the crucial central land location for the new Main Plant, and Entergy will be obligated to operate the entire system. Entergy will be reimbursed by LSUMC, in the proportion of the system's thermal energy production used by LSUMC, for all of Entergy's costs, such as energy, labor, insurance, indemnity, management, financing and capital costs. Entergy is responsible for its share of the costs associated with providing thermal energy to others. All of the foregoing contracts described above provide for options to extend the initial twenty (20) year term by two (2) additional time periods of five (5) years each.
LSU and Charity currently manufacture thermal energy, in-house, with facilities located on their respective properties. By cooperating with Entergy, you propose to consolidate and upgrade your thermal energy production, reduce pollution and, most significantly, relieve the Board of the burden of operating its own thermal energy production facilities. The two current operating units would be used for backup and emergency services.
The first issue presented is whether the Board has authority to enter into and perform its obligations under the proposed CEA pursuant to Article VII, § 14(C) of the Louisiana Constitution of 1974, participating with NORMC and Entergy to achieve (1) the private construction and financing of a multi-use building (the "Building") containing a 600 car parking garage and a thermal energy plant (the "New Plant") for the use, benefit and betterment of the Board and other various facilities in the NORMC area and their patients, employees and the public at large, and (2) LSU's agreement to reimburse Entergy for all the costs associated with such cooperative production of all present and future thermal energy requirements for all present and future LSUMC buildings in the NORMC area for a term of twenty years, subject to an annual appropriation dependency clause.
The cited provisions of the Constitution authorize the State and its political subdivisions to "engage in cooperative endeavors with each other, with the United States or its agencies, or with any public or private association, corporation or individual".
As stated in your opinion request of October 13, 1998: "The overall purposes of the CEA are to provide: (i) cost-efficient, pollutant-diminished thermal energy to the various public and private medical facilities and other public and private buildings in the Area; (ii) the reimbursement by LSUMC to Entergy of the costs associated with the portion of this cooperatively produced thermal energy which LSUMC uses; and (iii) six hundred additional parking spaces for use by employees and patients of LSUMC and the other medical facilities and members of the public at large in the Area. Clearly, these are all public purposes within the contemplation of the La. Const. 1974, Art. VII, § 14C and, therefore, meet the Constitutional requirements. Further, based upon the representations of the parties to the agreement, the benefits to be received by LSUMC and the Board are not so disproportionate so as to invalidate the agreement. See, e.g.
Attorney General's Opinion Number 96-440, which found," It is clear that the use of the proposed site for the purpose of building parking . . . primarily for the use by the state is for a "public purpose". Further, based upon the representations of the parties to the agreement, the benefits to be received by LSUMC and the Board are not so disproportionate so as to invalidate the agreement.
The second issue presented is whether the Board has the authority to enter into and perform its obligations under the Ground Lease for university land (Land) which it owns and controls in connection with its operation and management of the Charity Hospital System, and the Reciprocal Lease Agreement with NORMC, a non-profit entity, without obtaining legislative approval or complying with the Public Lease Law.
The Board would enter into a Reciprocal Lease Agreement with NORMC for a term of twenty years, whereby NORMC will grant unto the Board the exclusive right of use and occupancy of the parking deck portion of the Building to be constructed on the Land by NORMC, in consideration for the Board's granting NORMC the exclusive right of use and occupancy of two heating and cooling facilities (Charity Plant and the LSU Plant, collectively, the Plants). The Reciprocal Lease Agreement would further obligate NORMC, through a sublease of the Plants to Entergy, at its cost, to renovate and rehabilitate the Board's heating and cooling equipment in the Plants to be used as part of the district thermal energy system.
The Board acquired control, supervision and management of the Land and the Charity Plant thereon as a result of Acts 1997, No. 3 (La. R.S. 17:1519, et seq.). Under La. R.S. 17:1519.3(A) (3), the Board has authority to sell and lease in accordance with the general laws of the State. However, in order to sell or lease an "entire hospital facility to any entity other than another state agency . . . approval by the legislature . . . is required". The Land is occupied by two buildings which are to be demolished. The leases also cover the LSU Central Plant and the Charity Central Plant, both of which are essential to ongoing operations of both LSUMC and the Charity Hospital System.
As quoted above, the law addresses an "entire hospital facility", which could arguably include all land, buildings, facilities and systems of a hospital, or simply a portion which might be construed to be such a "facility", (i.e., the "entire utility plant" for the hospital). Although the hospital facilities cannot function without their utility plants, which provide vital heating and cooling functions, the language of the statute appears to contemplate the entirety of a hospital facility and not a single component, such as a utility plant. Therefore, under these circumstances, legislative approval does not appear to be required for this particular arrangement.
With regard to other statutory leasing requirements, the general rules for lease of State lands are found in Part I of Chapter 10 La. R.S. 41:1211, et seq., which includes in the term "lessor" state universities and colleges. Another general law, La. R.S.17:3361(A), provides an exception whereby a state university or college may grant leases "* * * of other immovable property under its supervision and management, for a term not to exceed ninety-nine years for each lease, to any of the following:
* * *
 (2) A religious, quasi-religious or benevolent organization or other non-profit corporation or association.
* * *
 (5) A private entity, provided such private entity shall be obligated under the terms of the lease agreement to construct improvements on the leased premises which will further the educational, scientific, research or public service functions of the "board. [Emphasis added.]
La. R.S. 17:3361(E) exempts such lease agreements from both La. R.S. 39:1643 and La. R.S. 41:1211 insofar as public advertisement and bidding might otherwise be required, where the statutes are applicable. However, in compliance with La. R.S. 17:3361(D), the Ground Lease provides that the Board must approve the plans and specifications for construction.
The provisions of La. R.S. 17:3361(A) (2), 17:3361(A) (5) and17:3361(B) pertain to the proposed transaction and the specific exceptions stated in the statutes, (i.e., other non-profit corporaiton (s) and "educational, scientific, research or public service functions of the board").
NORMC is designated as a nonprofit corporation, and the purpose of the proposal, as stated above, would benefit the statutorily prescribed functions of the Board. For these reasons, we find that the proposal is exempt from the Public Lease Law, and is not required to be advertised.
The third issue presented is whether, in furtherance of the CEA, and pursuant to the Ground Lease and the Reciprocal Lease Agreement, NORMC may construct the Building on the Land, and Entergy may rehabilitate the LSU Plant and the Charity Plant, without compliance with the Public Bid Law. Since NORMC (a nonprofit corporation) would construct the Building on the Land, and since Entergy (a private for-profit corporation) would rehabilitate the LSU Plant and the Charity Plant, neither would be required to follow the Public Bid Law. R.S. 17:3361(B).
The fourth issue presented is whether the Board has legal authority to enter into a cooperative endeavor agreement in the form of a District Energy Services Agreement (DESA) with Entergy, for a term of twenty years, subject to an annual appropriation dependency clause, without competitive bidding as may be required under the Louisiana Procurement Code (Code). Under the DESA, Entergy will serve all present and future thermal energy needs for all LSUMC buildings in the NORMC area. In return, LSUMC agrees to reimburse Entergy for the costs associated with the production of the thermal energy used by LSUMC facilities.
The Code was enacted in the interest of taxpaying citizens to simplify, and provide increased economy in, state procurement. La. R.S. 39:1552. Its basic requirement is for the purchase of supplies, services and major repairs by state agencies to be competitively bid. While it is not clear from the definitions of "services" and "supplies" in R.S. 39:1556(22) (25) that thermal energy falls within the scope of the Code, contemporaneous construction by the Office of State Purchasing holds that such purchases are subject to the Code and the Code is generally applicable to the Board and LSUMC. However, this office as well as our judiciary, have recognized limited exceptions to application of procurement statutes. Opinion Number 97-313 found that, "Cooperative endeavor agreements have occasionally been used in the past when a particular proposed project is unique and when the proposed partner in the cooperative endeavor agreement brings to the transaction value substantially in excess of the compensation to be paid by the state." We believe that this complex, multi-faceted transaction, including the DESA, between the Board, LSUMC, NORMC and Entergy, is such an exception. Also, since this supply of thermal energy involves the reimbursement of costs of production, including energy, labor, insurance, indemnity, management, financing and capital costs, it is not amenable to the bidding requirements of the Code.
As previously discussed, LSU and Charity currently manufacture thermal energy, in-house, with antiquated facilities located on three separate properties. This production is inefficient, at best. Under this series of complex transactions, LSUMC and Entergy will engage in a cooperative effort or joint venture to produce thermal energy to serve LSUMC facilities at a "most favored nation" rate for the life of the DESA. The benefits to be received by LSUMC, once the project has been completed, include, but are not limited to, the following:
 1. LSUMC will no longer have to operate its Central Utilities Plant.
 2. LSUMC's two Plants will be completely modernized and refurbished by Entergy to provide cost-efficient heating and cooling to its present and future facilities, thereby insuring an adequate supply of energy during peak demand periods.
 3. The new main energy plant will have a reliable 100% back-up chilling and heating capacity and stand-by generation to operate the plant in the event of a power failure.
 4. LSUMC will realize an operational savings of $969,000 per year on the cost of self-generation.
 5. LSUMC will no longer have to compete with hotels and private industry to attract and retain competent operating engineers and other key personnel.
 6. LSUMC will avoid operational costs attributable to personnel, maintenance, CFC issues and equipment replacement.
 7. Obsolete buildings will be demolished and, in their place, a new six-floor multi-use 240,000 sq. ft. building with a 600-car parking deck and thermal energy plant will be constructed.
 8. LSUMC will have the exclusive operation and use of the parking deck.
 9. The estimated construction cost of the parking garage is $6,000,000 to be borne by NORMC. Projected revenue to LSUMC from the operation of the garage is $370,000 per year.
 10. All new construction resulting from the Project will
revert to State-ownership after the expiration of the agreements.
 11. No future capital investment by LSUMC in utilities plants will be required for any future expansion.
Of paramount importance is the avoidance of future capital investment in utility plants. This is exemplified in two upcoming projects:
— Stanley Scott Cancer Center — a utilities plant will not be required on the first floor. This will save approximately $550,000 which can be spent on construction of the building. Approximately 2,000 sq. ft. on the first floor will be freed to be used for patient care.
— Critical Care Tower — an addition to the University Hospital utilities plant will not be required. This will save approximately $6,000,000 which can be spent on construction of the building.
The Project would be facilitated through a series of contracts and/or agreements, to wit: A 20 year ground-lease; contracts for the demolition of two buildings and the financing and construction of a 240,000 sq. ft., six-floor multi-use building to house a parking deck and thermal energy plant; reciprocal lease and sublease agreements for the installation and operation of a thermal energy plant and the rehabilitation and continued operation of two existing plants; a cooperative energy service agreement; and the stipulation for the reversion to State-ownership of all new construction at the expiration of the termsof the subject agreements.
As can be gleaned from the above discussion, the DESA is just one of many intricate agreements necessary to facilitate the completion of the project. It nevertheless represents one of the most essential facets of the single whole. It is impossible to isolate one of the several components of this CEA without considering the impact and value of the other components to the parties. We do not believe that the Code was designed to address such complex procurements. To hold otherwise, would constitute an unwarranted impractical restriction, predictably resulting in the demise of the entire project and the substantial benefit which it promises to the Board and the public.
The conclusions expressed herein are not intended to apply to other projects and/or contracting parties, each of which must be considered on its own individual facts and the laws applicable thereto.
Trusting this adequately responds to your inquiries, I am
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 By: _________________________ ROBERT E. HARROUN, III
Assistant Attorney General
RPI/Rob3/cla
Date Received:
Date Released:
Robert E. Harroun, III
Assistant Attorney General
[1] See Opinion Request for a full description of the legal status and membership of NORMC.